[Civ. No. 1505.   Third Appellate District.—June 5, 1916.]

GEORGE P. LOVEJOY, as Administrator, etc., Appellant, v. BLAIR HART et al., Respondents.

GIFTS OF MONEY—ACTION TO SET ASIDE—INSUFFICIENCY OF EVIDENCE.— In this action to have two certain gifts of money, made by a deceased person in her lifetime to a friend with whom she made her home for many years, set aside on the ground of mental incapacity and undue influence, it is held that the plaintiff failed to establish any sort of trust or fiduciary relation between the parties; or that the gift was secured by undue influence exercised over the donor; or that she was mentally and physically incompetent or in any degree incapable of managing her own affairs or comprehending the nature of the transaction by which she parted with all her property, or that she needed independent advice.

APPEAL from a judgment of the Superior Court of Sonoma County.   Thomas C. Denny, Judge.

The facts are stated in the opinion of the court.

Fred S. Howell, and W. D. L. Held, for Appellant.

J. W. Ford, and Thomas J. Geary, for Respondents.

CHIPMAN, P. J.—Plaintiff, as administrator of the estate of Ann La Point, deceased, brought the action to have two certain gifts of money made by deceased in her lifetime set aside and decreed invalid, null, and void.

The complaint is an elaborate statement of facts alleged on information and belief, in which is alleged a conspiracy entered into by defendants to induce the deceased to leave her husband, and representations are alleged to have been falsely and fraudulently made by defendants to deceased with the object of disrupting her marital relations with her husband and to arouse in her a sentiment of hatred toward and dislike of her husband, and that by reason thereof deceased was induced to leave her husband; that this fraudulent conspiracy had for its object the procurement from deceased the money she possessed, and that the gifts made to defendant Martha Hart by deceased were brought about through said conspiracy; that deceased was an old woman, feeble in mind and body and in poor health, and that her mind was perturbed and deranged thereby, "and that defendants poisoned the mind of deceased against her husband by representing that her husband would cheat her of her money"; that deceased was addicted to the use of alcoholic liquors, particularly beer, and consumed them in such quantities as seriously to affect her mind and understanding and incapacitate her for the management of her or any business; that, about March 1, 1895, defendants, by their said corrupt and fraudulent conspiracy and while deceased was residing with her then lawful husband, enticed decedent away from her said husband and induced decedent to live with them; that, on or about March 23, 1895, and while decedent was residing with defendants, decedent "did make a purported gift of the sum of $3,761.09 to the defendant Martha Hart, without any consideration whatever from said Martha Hart or from any other person or persons;" that at said time decedent was of the age of sixty-five years, "and that at said time decedent was feeble in mind and body, ignorant, and in weak health, and that her mind was perturbed and deranged thereby, and she was easily susceptible of influence and prejudice," and said gift "was procured and obtained by the defendants fraudulently and corruptly combining and conspiring together;" that said gift was the result of undue influence exercised upon decedent "by defendants fraudulently and corruptly combining together," and that, at the time she made said gift, decedent "was not free from duress, menace, fraud, and undue influence, but was in fact subjected to duress, menace, fraud, and undue influence by

and on the part of defendants, both corruptly and fraudulently combining and conspiring together;'' that at the time she made said gift decedent was not of sound mind. ·

In a second and separate cause of action a gift by deceased to defendant Martha Hart of nine hundred dollars, on. or about July 15, 1907, represented by a .certificate of deposit in a Petaluma bank, is alleged. The alleged facts leading up to said gift are much the same as in the first cause of action. It is also alleged ''that by reason of the foregoing facts and the domestic relation existing between decedent and defendants, a confidential and fiduciary relationship existed between decedent and defendants at all times while decedent resided with defendants aforesaid.''

The court found against plaintiff in respect of all the accusatory charges alleged in the complaint affecting the conduct and motives of defendants. The following findings are all that seem necessary to be stated:

''V. That on or about the 23rd day of March, 1895, while said decedent was residing with the defendants the said decedent made a free and voluntary gift of the sum of $3,761.09 to defendant Martha Hart.

''VI. That at the time said gift was made decedent was of the age of 65 years or thereabouts; that at said time decedent was not feeble in mind or body, or ignorant, or in weak health, and her mind was not perturbed or deranged and she was not easily susceptible of influence or prejudice, and was at said time of sound and disposing mind. . . .

''VIII. That the mind of said decedent did not become biased, poisoned or prejudiced against her said husband by reason of any representations or statements made to said decedent by the defendants or either of them; that the said decedent did not avoid meeting her said husband and did not at any time refuse to see or talk with him; that decedent was not at any time under the control, dominion, or undue influence of the defendants, or either of them; that at no time while the said decedent resided with defendants was she ignorant, or weak in mind or body. . . .

''XI. That on or about the 15th day of July, 1907, while decedent was residing with defendants, the said deceased duly indorsed and delivered to defendant Martha Hart a good and valid certificate of deposit payable to the order of decedent and drawn on the William Hill Bank of Petaluma,

California, for the sum of $900. That said certificate of deposit was a gift from decedent to Martha Hart; that on the 15th day of July, 1908, defendant Martha Hart duly cashed said certificate of deposit at the Petaluma National Bank for the full sum of $900.00.

"XII. That at the time said certificate of deposit was indorsed and delivered to defendant Martha Hart, as a gift, decedent was of the age of 77 years, or thereabouts; that at said time, or at any other time said decedent was not feeble in mind or body, or ignorant, or in weak health, and decedent was not at any time stupefied, or her mind perturbed or deranged by the daily or other use and consumption of alcoholic liquor, commonly known as beer, and she was not at any time easily, or at all susceptible of influence or prejudice. . . .

"XV. That at the time said gift was made, and at all other times, said decedent was of sound mind. . . .

"XVII. That decedent was not on the 23rd day of March, 1895, or at any other time under the control, dominion or influence of defendants, or either of them; that at said time decedent was of the age of 65 years or thereabouts; that decedent was not weak in mind or body, or ignorant in business or financial matters; that the mind of said decedent was not at any time subsequent to the 23rd day of March, 1895, nor for a long time, or any time prior thereto benumbed or stupefied by the daily or long continued use of alcoholic liquor, commonly known as beer, or any other intoxicating liquor; that decedent was not made incompetent thereby, or at all; that no confidential or fiduciary relationship existed at any time between decedent and defendants, or either of them; that at the time said gift was made the acts, deeds or conduct of decedent pertaining to her business or financial matters were not guided, influenced or controlled by the defendants, or either of them; that no position of trust, confidence or superiority of mind or intellect over said decedent was ever held or exercised by defendants, or either of them.''

As conclusions of law the court found that both said sums were gifts freely and voluntarily made, and judgment passed accordingly. Plaintiff appeals from the judgment on bill of exceptions.

On this appeal, plaintiff, in his brief, states that ''actual fraud, sufficient of itself, and standing alone, to avoid the gifts in question, has, perhaps, not been shown here.'' It

is further stated: "We are seeking the application of those equitable principles which forbid one standing in a superior and dominant position from benefiting by the act of him who bestows confidence and trust in the donee; which forbid one while standing in the position of a guardian or protector, the fruits of transactions with his ward, or dependent, to his own financial gain. The confidence and trust which exist between such persons must ever remain inviolate," etc. It is quite manifest that the grounds now urged for a reversal of the judgment depend upon the truth of the assumption that a fiduciary and confidential relation of trust and confidence existed between defendants and Mrs. La Point, and hence it was incumbent upon defendants "to show affirmatively and clearly that their transactions" with Mrs. La Point "were conducted fairly, openly, and that no undue advantage has been taken" of her. It will at once be seen that the premise from which appellant draws his conclusion is that a fiduciary relation of confidence and trust existed between the parties concerned. The court found that such relation did not exist. No natural or artificial relation existed from which that of confidence and trust might arise by implication or presumption—such as *cestui que trust* and trustee, parent and child, husband and wife, guardian and ward. These persons, the La Points and Harts, had been neighbors and friends for several years prior to 1895; Mrs. Hart visited Mrs. La Point frequently and enjoyed the friendship and esteem of the latter to a greater extent, perhaps, than other of her neighbors. Mr. Hart had no business relations with La Point or his wife, and had no occasion or inducement to sustain other than the ordinary relationship existing between neighbors. There was no evidence that would have justified the court in finding the existence of what in the mind of a chancellor or in the contemplation of law or equity would be regarded as a relation of trust and confidence such as appellant seeks to attribute to these persons. Nor do we think that the subsequent conduct of the Harts and Mrs. La Point, as shown by the evidence, would have warranted the court in finding otherwise than it did—"that no confidential or fiduciary relationship existed at any time between decedent and defendants or either of them; . . . that no position of trust, confidence or

superiority of mind or intellect over said decedent was ever held or exercised by defendants, or either of them.''

It appeared that, in February, 1895, Ann La Point and her husband were living on a small place at Lakeville, Sonoma County, which belonged to Ann as her separate property and upon which her husband had conducted a road-house or saloon for a number of years. They were married in 1875. They lived together until March 1, 1895, when Mrs. La Point went to the home of the defendants and took up her residence with them, and so remained until about March 19, 1912, when she died intestate, having lived with defendants seventeen years. There was testimony as to the cause of her having left her husband which, among other grounds, tended to show that he had diverted his affection from his wife and bestowed it upon another woman. Mrs. Hart testified: ''She came to me in her trouble and told me she was afraid of her life, and she says, 'Fred [her husband] has driven me out of my home.' And for that reason, she says, 'I have no roof over my head,' and I says, 'You have one now,' and she says, 'Yes,' and I says, 'Well, stay under it,' and that is all I had to say. She came there crying; an old lady sixty-five years old.'' La Point testified: ''I did not sleep in the old house occupied by my wife during the last year before she left, and not more than two or three times during the last two years. I spent most of my spare time in my brother's house, listening to my sister-in-law [his alleged affinity] reading. I lived at Lakeville about two or three weeks and at Petaluma for one year after my wife left me, and I made no effort to get into communication with her. My sister-in-law and I went off on several trips together; we went hop-picking once for about three weeks. That was not the cause of the trouble between my wife and I. I went to British Columbia with my sister-in-law and my brother and was gone about two and a half years. I did not write to my wife while I was gone nor to anyone else at Lakeville to inquire about my wife. I felt that if she was satisfied to call it quits I was. . . . From the time I returned from British Columbia in 1899 down to the time of my wife's death, about a year ago, I never saw her to speak to her. I made no effort to see her. I was perfectly satisfied to let her live as she was living if she would let me alone. I made no effort to ascertain if she was being cared

for or not. I do not know how the Harts were treating her. I did not go to my wife's funeral because I did not feel like it. She was buried at Petaluma and I was living at Petaluma at the time." He testified that he had a policy for two thousand dollars payable to his wife, but, in 1894, he had it made payable to his sister and nephew. "I had the policy changed because I knew my wife had plenty, and she wouldn't give me any of her money and I didn't intend she should have any of mine. My wife was pretty stubborn, when she made up her mind I could not change it."

It was shown that, on March 23, 1895, Mrs. La Point caused her credit account of $3,761.09 in an Oakland savings bank to be transferred to Mrs. Hart, and, on July 15, 1907, she assigned to Mrs. Hart a certificate of deposit calling for nine hundred dollars in a Petaluma bank, which Mrs. Hart cashed. There was testimony as to the drinking habit of deceased prior to leaving her husband, the purpose being to support the charge that her excessive use of intoxicants weakened her mind and body and rendered her incompetent. The testimony was conflicting on this point, but we think the testimony justified the finding of the court already noted. This testimony related to a period before she left her husband, and while it may have had a bearing upon her condition when the first gift was made, there was no evidence that she was addicted to the use of intoxicants to excess, or at all, for that matter, after she went to live with the Harts, and hence had no bearing upon her condition in 1907, twelve years later, unless the alleged effect of her early alleged intemperance continued, and this is not shown. Testimony as to the mental condition generally of Mrs. La Point was introduced and some witnesses testified that she was "simple" and that her conversation was "childish" or "child-like." Several witnesses who had known her for many years intimately, both before and after she went to the Hart's home, testified that she was perfectly sound in mind. The court so found on sufficient evidence. There was testimony also that while living with the Harts she appeared "to be happy and contented," and that her affection for the Harts and theirs for her was mutual.

There was but little testimony as to the circumstances immediately attending these gifts, and what there was came from Mrs. Hart, whose testimony was taken at the instance

of plaintiff in the matter of the estate of Ann La Point, deceased, and was used at the trial. Speaking of the first gift, she testified that when Mrs. La Point made the transfer she asked Mrs. Hart to go with her to Oakland, and told her she wanted to give her her money. "She said, 'I want to give you my money, Mattie,' she says, 'I want you to go with me; I want to give you my money.' Q. Did she say anything else? A. No, she wanted to give me her money. . . . Q. What did she ever say about that money that she left? A. Five years ago she told me, she said, 'Mattie, I want you to have my money; I don't want Fred or his people to have one dollar that I have; I want you to have it.' Q. Did you ever have any discussion with the deceased, Mrs. La Point, in regard to board and keeping? A. No. Q. You did not expect to keep her for nothing until she died, did you, Mrs. Hart? A. I never thought of anything like that; she came to me in her trouble and told me she was afraid of her life and, she says, 'Fred has driven me out of my home.'" It appeared that Mrs. La Point sold the place where she and her husband had formerly lived and some time later, July 15, 1907, she assigned the certificate of deposit to Mrs. Hart. This was all the property she had left after her gift of the deposit in the Oakland bank. The property brought nine hundred dollars. Mrs. Hart testified as to this nine hundred dollars: "Q. Wasn't it understood that that money was to be used for her expenses and board? A. No, she never said one thing as to what I was to do with her money. It was used for her funeral expenses and fixing up the cemetery, that money she gave me." She testified: "Q. Did she ever consult you and act on your advice in any matter? A. Any matters? Q. Her business matters. A. Her troubles? Q. No, in her family affairs; her business matters. A. No, not her business matters. She didn't have any business matters, only she wanted to give me her money; that's the only business matters. . . . Q. Didn't she say she wanted you to have this money when she died? A. She never said 'died'; she said she wanted me to have the money. . . . Q. Had she been turned out of your house she would have been penniless? A. No, she would not; she would not have been turned out of our house, in the first place. Q. I am assuming that she would. A. Well, she would never have been turned out; if anything would have happened to

me my husband would have looked out for her; and if anything would have happened to him my children would have looked out for her. My children looked to her just the same as if she were a relative; she came to us when they were tiny. . . . Q. As far as you ever noticed or observed she was perfectly capable of handling her own affairs and did not require anyone's advice; is that a fact? A. Yes, sir. . . . Q. And her mind was perfectly bright and clear? A. Oh, yes; bright and clear until the day she died. . . . Q. How long have you known Mrs. La Point, how many years? A. Let's see,—oh, I guess 33 or 34 years. Q. And you have been friendly all that time? A. Oh, yes; the best of friends. The Court: She was no relation to you? A. No; just old friends."

It does not seem necessary to pursue the evidence further. Appellant failed to establish any sort of trust or fiduciary relation between the parties; or that the gift was secured by undue influence exercised over the donor; or that she was mentally or physically incompetent or in any degree incapable of managing her own affairs or comprehending the nature of the transaction by which she parted with all her property, or that she needed independent advice. She lived in apparent happiness and contentment with defendants for seventeen years, and was cared for as one of the family. If, as is claimed, "in stripping herself of every dollar she had without any consideration," she did an improvident and unusual act, this alone carries no implication of fraud, undue influence, or incompetence. She had a right to do what she pleased with her own. She probably, on the score of long friendship, believed that she would find a home with defendants as long as she might live, and was willing to give her money to Mrs. Hart in this belief, and the facts show that if such was her motive she was not disappointed. But, whatever her motive, we find no facts or circumstances surrounding the transaction which impeach the validity of the gift.

The judgment is affirmed.

Hart, J., and Ellison, J., *pro tem.,* concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 3, 1916.